UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
KING PHARMACEUTICALS, INC., et al.,  )
                                                              )
    Plaintiffs,                                     )
                                                              )
    v.                                                   )       Civil Action No. 04-1058 (RBW)
                                                              )
UNITED STATES FOOD AND DRUG       )
ADMINISTRATION, et al.,                       )
                                                              )
    Defendants.                                    )
_____)

## MEMORANDUM OPINION

       One of the few things that the parties agree upon is that this case presents both a factually

and legally unique situation that implicates The Drug Price Competition and Patent Term

Restoration Act of 1984 (the "Hatch-Waxman Act"), which amended the Federal Food, Drug and

Cosmetic Act, 21 U.S.C. § 301 et seq.  The plaintiffs, King Pharmaceuticals, Inc. and Jones

Pharma, Inc. (collectively "King"), seek a temporary restraining order and mandatory preliminary

and permanent injunctions that would require the United States Food and Drug Administration

("FDA") to revoke the approval of applications filed by Mova Pharmaceuticals, Inc. ("Mova")

and Jerome Stevens, Inc. ("Jerome Stevens") pursuant to 21 U.S.C. § 355(b)(2) ("Section

505(b)(2)"), which approved an "AB" bioequivalent rating for the applicants' and King's orally

administered levothyroxine sodium product.  Complaint ¶¶ 1, 46-53.  The plaintiffs assert that

the FDA improperly accepted Mova and Jerome Stevens' Section 505(b)(2) supplemental New

Drug Applications ("NDA") because they failed to comply with certain patent certification

requirements listed in Section 505(b)(2)(A).  Motion of Plaintiffs King Pharmaceuticals, Inc. and

Jones Pharma Inc. for a Temporary Restraining Order and Preliminary Injunction, Memorandum

of Points and Authorities in Support of Motion of Plaintiffs King Pharmaceuticals, Inc. and Jones

Pharma Inc. for a Temporary Restraining Order and a Preliminary Injunction ("Pls.' Mem.") at 8.

In opposition to the plaintiffs' position, the FDA and defendant-intervenors Alara

Pharmaceuticals Corporation and Sandoz Inc. (collectively "Mova/Alara")[1] assert that the

procedural requirements set forth in Section 505(b)(2)(A) are not applicable in this case since the

plain language of the statute only requires patent certification if an applicant for an NDA relies

upon a prior safety and efficiency investigation.  Defendant-Intervenors' Memorandum of Points

an Authorities in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and

Preliminary Injunction ("Interv. Mem.") at 11-14.  Upon consideration of the parties' papers,

their oral arguments made during a hearing on the motion before the Court, and for the reasons

set forth below, the Court will deny the plaintiffs' motion.

## I.  <u>Factual Background</u>

Levothyroxine sodium "is the sodium salt of the levo isomer of the thyroid hormone

thyroxine."  62 Fed. Reg. 43,535, 43,535 (Aug. 14, 1997).  Such hormones "affect protein, lipid,

and carbohydrate metabolism; growth; and development.  They stimulate the oxygen

consumption of most cells of the body, resulting in increased energy expenditure and heat

production, and possess a cardiostimulatory effect that may be the result of a direct action on the

heart."  <u>Id.</u>  Prior to August 1997, the FDA did not regulate levothyroxine sodium.  Interv. Mem.

at 3-4.  However, "[b]etween 1987 and 1994, [the] FDA received 58 adverse drug experience

---

[1]  Mova Pharmaceutical Corporation filed a NDA that was later transferred to Alara.  Sandoz is a party to an agreement with Alara to market Alara's levothyroxine sodium product.  The Court will refer to these entities collectively as "Mova/Alara."

reports associated with the potency of orally administered levothyroxine sodium products." 62

Fed. Reg. at 43,536.  Because of concerns regarding a "lack of consistency in stability, potency,

and bioavailability between different lots of tablets from the same manufacturer" and that there

was "evidence that manufacturers continue[d] to make formulation changes to orally

administered levothyroxine sodium products[,]" id., the FDA concluded that "any orally

administered drug product containing levothyroxine sodium [was] a new drug under section

201(p) of the act . . . and is subject to the requirements of section 505 of the act." Id. at 43,538.

The FDA determined that "[m]anufacturers who wish to continue to market orally administered

levothyroxine sodium products must submit applications as required by section 505 of the act

and part 314 (21 CFR part 314)." Id.  With this in mind, the FDA announced that it would

"permit orally administered levothyroxine sodium products to be marketed without approved

NDA's until August 14, 2000, in order to give manufacturers time to conduct the required studies

and to prepare and submit applications, and to allow time for review of and action on these

applications."  This compliance deadline was later extended by one year to August 14, 2001.  65

Fed. Reg. 24488, 24489 (Apr. 26, 2000).  In July 2001, the FDA released a guidance document

designed to explain how it would enforce its earlier pronouncements with respect to the

regulation of orally administered levothyroxine sodium products.  Interv. Mem., Declaration of

Francis A. Vasquez, Jr., Exhibit 4 ("Guidance for Industry: Levothyroxine Sodium Products

Enforcement of August 14, 2001 Compliance Date and Submission of New Application") ("July

2001 Guidance").  In its July 2001 Guidance, the FDA explained that

> [u]ntil August 14, 2001, FDA will continue to accept 505(b)(2) applications
> for levothyroxine sodium products.  After that time, FDA will exercise its
> authority under section 314.101(d)(9) to refuse to file a 505(b)(2) application

submitted for a levothyroxine sodium product that is eligible for approval
under section 505(j).  A manufacturer who wishes to submit an application for
such a product after August 14, 2001, should submit an abbreviated new drug
application (ANDA).

Id. at 4.  The FDA also explained the applicable procedures to gain a therapeutic equivalence

rating, noting that

> [a]t the time of the issuance of this guidance, there were two approved 505(b)(2)
> applications for levothyroxine sodium tablets.  These two, and any 505(b)(2)
> applications approved in the future, will be listed in *Approved Drug Products*
> *with Therapeutic Equivalence Evaluations* (the Orange Book) as BX-rated
> drug products for which the data are insufficient to determine therapeutic
> equivalence.  To obtain a therapeutic equivalence rating other than BX for
> levothyroxine sodium tablets, an applicant should submit data comparing
> its product to a listed drug.  If upon review of the data, the two products
> are determined by FDA to be bioequivalent, they would be AB-rated to
> each other in the Orange Book.

Id. at 5.

It is undisputed that both Mova/Alara and Jerome Stevens, along with the plaintiffs,

submitted Section 505(b)(2) applications before the August 14, 2001 deadline.  Memorandum in

Opposition to Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction

("FDA Mem.") at 10; Pls.' Mem. at 4-5; Interv. Mem. at 6.  In fact, the plaintiffs acknowledge

that in August 2000, Jerome Stevens' levothyroxine sodium product (Unithroid) became the first

levothyroxine sodium product approved under the new requirements.  Pls.' Mem. at 4.

Subsequently, in May 2001, the plaintiffs obtained FDA approval for their own levothyroxine

sodium product (Levoxyl).  Id.  In March 2002, Mova/Alara received approval of their Section

505(b)(2) application for their levothyroxine sodium product (Levo-T).  Id. at 5.  While both

Mova/Alara and Jerome Stevens had approved NDAs for their levothyroxine sodium products, in

March 2003 they submitted NDA supplements seeking therapeutic equivalence findings from the

4

FDA that their products were the AB-equivalent of King's levothyroxine sodium product.  Id. at

8.  The plaintiffs explain that

> [s]uch a rating signifies that the two products are therapeutically
> equivalent and have been shown to be bioequivalent.  'Drug products are
> considered to be therapeutic equivalents only if they are pharmaceutical
> equivalents and if they can be expected to have the same clinical effect
> and safety profile when administered to patients under the conditions
> specified in the labeling.'  Pharmaceutical equivalents contain the same
> active ingredient, are of the same dosage form and route of administration,
> and are identical in concentration or strength.  Hence, in the marketplace,
> a generic product that is 'AB' rated to a branded product may be freely
> substituted at the pharmacy level.

Id. (citations omitted).  On June 23, 2004, the FDA approved both Mova/Alara's Levo-T and

Jerome Stevens' Unithroid as AB-equivalent to King's Levoxyl.  Id. at 9, Ex. A-B (FDA

approval letters).  The instant lawsuit seeking to force the FDA to revoke the AB-equivalency

determination for Levo-T and Unithroid was filed shortly thereafter on June 28, 2004.

## II.    Standard of Review

It is well understood that in considering the plaintiff's motion for a preliminary injunction,

this Court must weigh the following four factors: "(1) whether the plaintiff has a substantial

likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury were

an injunction not granted; (3) whether an injunction would substantially injure other interested

parties; and (4) whether the grant of an injunction would further the public interest."  Al-Fayed v.

CIA, 254 F.3d 300, 303 (D.C. Cir. 2001); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066

(D.C. Cir. 1998); CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir.

1995).  The Court must balance the moving party's claims against the position of the non-movant

in each of these four areas and may issue an injunction if one factor is particularly strong, even

though the remaining criteria are weak.  CityFed, 58 F.3d at 747 (holding that an injunction may

be proper "where there is a particularly strong likelihood of success on the merits even if there is

a relatively slight showing of irreparable injury.");  Health Ins. Ass'n of Am. v. Novelli, 211 F.

Supp. 2d 23, 28 (D.D.C. 2002) (Walton, J.).  Even with this in mind, the Court must remain

aware that preliminary injunctive relief is an extraordinary remedy that must be sparingly

granted.  See Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 215 (D.D.C. 1996) (citing

Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1996)).  And profoundly significant to this

case, the Court notes that it is "particularly important for the movant to demonstrate a substantial

likelihood of success on the merits." Adair v. England, 217 F. Supp. 2d 1, 4 (D.D.C. 2002).

### III.    Legal Analysis

The crux of the plaintiffs' legal argument is that the FDA acted in an arbitrary and

capricious manner in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §

706(2)(A), when it approved Mova/Alara and Jerome Stevens' supplemental NDAs seeking AB

equivalence ratings to King's Levoxyl.  Specifically, the plaintiffs contend that the FDA failed to

comply with Section 505(b)(2)(A)'s patent certification requirements and ignored its own

regulation, 21 C.F.R. § 314.101(d)(9), and the July 2001 Guidance when it approved

Mova/Alara's and Jerome Stevens' supplemental NDAs.  Pls.' Mem. at 18-19.  The plaintiffs

assert that "unless FDA approval is revoked, King will suffer immediate and irreparable injury"

because "[t]he inappropriate availability of generic versions of King's Levoxyl will cause King to

lose a significant share of the market for levothyroxine sodium drug products." Id. at 9.

However, because this Court finds that the plaintiffs are unable to show a substantial likelihood

of success on the merits, it must deny the plaintiffs' motion.[2]

In assessing whether the plaintiffs have demonstrated a substantial likelihood of success on the merits, because this matter involves an APA challenge and the FDA's interpretation of a statute it is entrusted to administer, the Court must begin its analysis by examining whether the Court should defer to the FDA's interpretation of the statute. A challenge to an agency's construction of a statute it administers is subject to the standard of review articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Pursuant to the familiar Chevron test, the Court must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. And, in making such an assessment, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" Id. at 844. The Chevron Court explained that

> the principle of deference to administrative interpretations[] has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

Id. (internal quotation omitted). Thus, if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [a

---

[2] In balancing the preliminary injunction factors, the Court notes that it does not find any of the remaining elements to be particularly compelling in favor of any party.

court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Id. at 845.

In addition, the Court notes that deference is especially appropriate when the regulation in question is a "complex and highly technical regulatory program" which requires "significant expertise and . . . exercise of judgment grounded in policy concerns." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991). The intervenors note that "[c]ourts have explicitly recognized that the Hatch-Waxman scheme of drug approval is both 'technical,' Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 676 (1990), and 'complex,' Valley Drug Co. v. Geneva Pharm., Inc., 344 F.3d 1294, 1296 (11th Cir. 2003)." Interv. Mem. at 17.

However, in United States v. Mead Corp., 533 U.S. 218 (2001), the Supreme Court noted that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances[.]" Id. at 228. In this regard, the Court in Christensen v. Harris County, 529 U.S. 576 (2000), stated that

> an interpretation contained in an opinion letter, [is] not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking [and thus i]nterpretations such as those in opinion letters - - like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law - - do not warrant Chevron-style deference.

Id. at 587 (citations omitted). When reviewing opinion letters, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Mead, 533 U.S. at 228 (citations omitted). "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to

control."  Id. (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)) (internal quotation

marks omitted).  Interpretations that are contained in opinion letters are "'entitled to respect'

under the Supreme Court's decision in Skidmore . . . but only to the extent that those

interpretations have the 'power to persuade[.]'"  Christensen, 529 U.S. at 587 (quoting Skidmore,

323 U.S. at 140).

    While this Court, as it will explain below, finds that Congress has directly spoken to this

issue, as the plain language of Section 505(b)(2) is unambiguous, even if this Court were to

conclude that the Section 505(b)(2) is ambiguous with respect to the patent certification

requirement, it must conclude at this time, with the case in its current posture, that the FDA's

construction of this statute is certainly a permissible one, under either Chevron or Skidmore.[3]

Mindful of the landscape in which it must operate, the Court will examine the statute at issue

(Section 505(b)(2)) to determine whether Mova/Alara's and Jerome Stevens' supplemental

NDAs were required to contain patent certifications.  Section 505(b)(2) states:

>    An application submitted under [Section 505(b)(1)] for a drug for which
> the investigations described in clause (A) of such paragraph and relied
> upon by the applicant for approval of the application were not conducted
> by or for the applicant and for which the applicant has not obtained a
> right of reference or use from the person by or for whom the investigations
> were conducted shall also include - -
>>    (A) a certification, in the opinion of the applicant and to the best
>> of his knowledge, with respect to each patent which claims the
>> drug for which such investigations were conducted or which
>> claims a use for such drug for which the applicant is seeking
>> approval under this subsection and for which information is
>> required to be filed under paragraph (1) or subsection (c) of
>> this subsection . . . .

---

[3]  The Court therefore need not determine at this time what level of deference should be given to the FDA's
interpretation.

21 U.S.C. § 355(b)(2).  Section 505(b)(2)'s reference to "clause (A)" implicates Section

505(b)(1)(A), which states that NDAs must contain "(A) full reports of investigations which have

been made to show whether or not such drug is safe for use and whether such drug is effective in

use . . . ."  21 U.S.C. § 355(b)(1)(A).  Thus, the FDA posits that the plain language of Section

505(b) mandates that an NDA applicant submit a patent certification only under circumstances

when the applicant does not rely upon safety and efficacy investigations conducted by or for the

applicant.  FDA Mem. at 15-16.  Here, because Mova/Alara's and Jerome Stevens' NDA

supplements did not rely upon safety and efficacy investigations conducted on another drug, the

FDA asserts that patent certification was not necessary.  Id. at 16.  Furthermore, the FDA states

that this interpretation is fully consistent with its implementing regulation which provides that a

Section 505(b)(2) application is required to contain "a certification with respect to each patent . .

. that . . . claims a drug . . . on which investigations that are relied upon by the applicant for its

approval of its application were conducted or that claims an approved use for such drug and for

which information is required to be filed under [Section 505(b) and (c)] . . . ."  21 C.F.R. §

314.50(i)(1)(i).  In assessing the persuasiveness of the FDA's position that no patent certification

was necessary by Mova/Alara and Jerome Stevens due to the fact that they did not rely upon the

safety and efficacy investigations conducted on another drug, the Court finds significant the

FDA's observation that "[i]n fact, there were no proprietary [Section 505(b)(1)(A)]

investigations for any of the [levothyroxine sodium] products[, as] their safety and effectiveness

was established by publicly-available literature."  FDA Mem. at 16.  The FDA points out that the

NDA supplements submitted by Mova/Alara and Jerome Stevens simply asked for a

bioequivalency determination.  Id.

In addition to their position that the FDA's approval of the application violated the plain language of Section 505(b)(2), the plaintiffs argue that the FDA acted arbitrarily and capriciously by failing to act in conformity with 21 C.F.R. § 314.101(d)(9) and its July 2001 Guidance by not requiring Mova/Alara and Jerome Stevens to submit Abbreviated New Drug Applications ("ANDAs") pursuant to 21 U.S.C. § 355(j) ("Section 505(j)"), rather than NDA supplements pursuant to Section 505(b)(2).  Pls.' Mem. at 18-19.  The Court need not spend much time on this argument for the following reasons.  First, 21 C.F.R. § 314.101(d)(9) states that the FDA "may" refuse to file a Section 505(b)(2) application if it is submitted "for a drug that is a duplicate of a listed drug and is eligible for approval under section 505(j) of the act[,]" which governs the filing of ANDAs.  However, as the FDA points out, "[b]y its own terms, the regulation is permissive, not mandatory."  FDA Mem. at 17.  And with respect to the FDA's July 2001 Guidance, it states that

> [u]ntil August 14, 2001, FDA will continue to accept 505(b)(2) applications for levothyroxine sodium products.  After that time, FDA will exercise its authority under section 314.101(d)(9) to refuse to file a 505(b)(2) applications submitted for a levothyroxine sodium product that is eligible for approval under section 505(j).  A manufacturer who wishes to submit an application for such a product after August 14, 2001, should submit an abbreviated new drug application (ANDA).

July 2001 Guidance at 4.  The FDA takes the position that this paragraph of the July 2001 Guidance does not have any applicability to the circumstances of this case because both Mova/Alara and Jerome Stevens filed their NDAs well before the August 14, 2001 deadline.  FDA Mem. at 18.  The FDA further asserts that this paragraph only concerns initial approval of a NDA and has no applicability to NDA supplements, since it would be unnecessary and a waste of

government resources to require Mova/Alara and Jerome Stevens to satisfy all the requirements

of Section 505(j), including "new submission and review of, among other things, the chemistry,

manufacturing, and controls information that [the applicants] had already submitted in the

original [Section 505(b)] applications." Id. at 18-19.  The Court finds this position persuasive.

Finally, the Court also finds it important to note that it finds the plaintiffs' argument that

the FDA's actions have undermined the objectives of the Hatch-Waxman Act to be without

merit.  As the plaintiffs accurately observe, the Hatch-Waxman Act

> 'emerged from Congress's efforts to balance two conflicting policy objectives:
> to induce brand name pharmaceutical firms to make the investments
> necessary to research and develop new drug products, while simultaneously
> enabling competitors to bring cheaper, generic copies of those drugs to market.'
> The result was a compromise between the research-based and generic
> industries whereby generic manufacturers obtained the ability to gain approval
> based upon proprietary innovator data and to infringe patents prior to
> expiration in order to conduct tests necessary for FDA approval.  In return,
> pioneers were promised the restoration of a portion of the patent term lost
> during FDA review, a meaningful opportunity to vindicate patent rights
> prior to generic approval and market entry, and limitations on generic
> companies' use of their proprietary data.

Pls.' Mem. at 10 (citations omitted).  And, as the FDA cogently points out, the plaintiffs'

position "is ironic, to say the least," since they, like Mova/Alara and Jerome Stevens, did not

conduct their own safety and efficacy investigations, but "simply relied on published literature to

gain NDA approval for its product."  FDA Mem. at 21.  Thus, the concerns underlying the

passage of the Hatch-Waxman Act that generic companies would merely "piggyback" on the

research and clinical trials conducted by proprietary innovators is clearly not the reality of what

occurred in this case.

**IV.   Conclusion**

For the aforementioned reasons, the Court finds that it must deny the plaintiffs' motion for a temporary restraining order and mandatory preliminary and permanent injunctions that would require the FDA to revoke the approval of the Section 505(b)(2) applications filed by Mova/Alara and Jerome Stevens for "AB" bioequivalent ratings because these applicants failed to file patent certifications.  This result is not only the product of the Court having afforded deference to the FDA's interpretation that patent certifications were unnecessary in this situation, but also because the plain language of Section 505(b)(2) seemingly mandates this conclusion. Moreover, the FDA's implementing regulations and its July 2001 Guidance do not require a different result.  Accordingly, the Court will deny the plaintiffs' motion.

**SO ORDERED** this 8th day of July, 2004.[4]

REGGIE B. WALTON
United States District Judge

---

[4] An Order consistent with the Court's ruling was previously issued.